**2014-1561, -1625, -1626**

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

LINEX TECHNOLOGIES, INC., A DELAWARE COMPANY,

Plaintiff-Appellant,

v.

APPLE, INC., A CALIFORNIA CORPORATION,

Defendant-Cross Appellant,

AND

ARUBA NETWORKS, INC., A DELAWARE CORPORATION,

Defendant-Cross Appellant.

Appeals from the United States District Court for the
Northern District of California in No. 4:13-cv-00159-CW,
Judge Claudia Wilken

## REPLY BRIEF OF APPELLANT

J. MICHAEL JAKES
KARA F. STOLL
RAJEEV GUPTA
KENIE HO
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
WASHINGTON, D.C. 20001
(202) 408-4000

*Attorneys for Appellant Linex Technologies, Inc.*

January 30, 2015

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Linex Technologies, Inc. certify the following:

1.    The full name of every party or amicus represented by me is:

Linex Technologies, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Linex Technologies, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

**Finnegan, Henderson, Farabow, Garrett & Dunner, LLP**: Smith R. Brittingham, IV, Barry W. Graham, Cecilia Sanabria, Jia W. Lu, Kenie Ho, Laura P. Masurovsky, Rajeev Gupta, Rama G. Ellura, Richard H. Smith, Robert F. McCauley, Robert D. Wells, Scott Herbst, Troy E. Grabow, Vincent P. Kovalick, Kara F. Stoll, J. Michael Jakes.

**Proctor Heyman LLP**: Melissa N. Brochwicz Donimirski, Neal C. Belgam.

i

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................1

REPLY IN SUPPORT OF LINEX'S APPEAL .......................................4

I.    THE DISTRICT COURT'S SUMMARY JUDGMENT OF
      ANTICIPATION SHOULD BE REVERSED ...............................4

      A.    Paulraj Fails to Expressly or Inherently Teach Transmitting
            "Special" Signals or "Known" Signals *Along With* and *In* the
            Signals Carrying Payload Data as Required by the Non-
            Spread-Spectrum Claims .......................................................4

      B.    The Non-Spread-Spectrum Claims Require Signals
            Transmitted From a Single Source .......................................9

      C.    Paulraj Does Not Disclose Signals *Transmitted* From a
            Single Source but Rather Teaches Doing the Opposite ......................16

II.   THE DISTRICT COURT'S SUMMARY JUDGMENT OF
      NONINFRINGEMENT OF THE SPREAD-SPECTRUM
      CLAIMS SHOULD BE REVERSED ...........................................17

      A.    Neither the Claims, Specification, or Ordinary Meaning of
            "Data" Limits Spread Spectrum Data to "Unknown" Data ...............17

      B.    Contrary to Defendants' Suggestion, Other Courts Have Not
            Limited "Spread Spectrum Signals" to Only "Unknown"
            Data .................................................................................21

      C.    As Properly Construed, the Accused Products Infringe the
            Spread-Spectrum Claims .....................................................22

      D.    The District Court Erred by Ignoring Dr. Prucnal's
            Testimony, Which Raised Genuine Issues of Material Fact ..............23

RESPONSE TO DEFENDANTS' CROSS-APPEAL ...........................27

III.  STATEMENT OF FACTS ..........................................................27

IV.   ARGUMENT............................................................................28

A.    The District Court Properly Found Summary Judgment of
No Anticipation by Paulraj for the Spread-Spectrum Claims.............28

B.    The District Court Already Found Summary Judgment of
No Anticipation by Paulraj Based on Linex's Proposed
Construction of Spread Spectrum Signals and Infringement
Theory.................................................................................................30

CONCLUSION .........................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Continental Can Co. USA v. Monsanto Co.*,
948 F.2d 1264 (Fed. Cir. 1991) ............................................................................5

*Linex Technologies, Inc. v. Belkin International, Inc.*,
No. 2:07-cv-00222-JDL (E.D. Tex. June 1, 2007), Dkt. No. 338 ................21, 22

*Linex Technologies, Inc. v. Motorola, Inc.*,
No. 9:05-cv-80300-KAM (S.D. Fla. Nov. 17, 2010), Dkt. No. 152 ............21, 22

*National Presto Industries, Inc. v. West Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996) .....................................................................28, 29

*Stewart-Warner Corp. v. United States*,
748 F.2d 663 (Fed. Cir. 1984) ...........................................................................19

*Williamson v. Citrix Online, LLC*,
770 F.3d 1371 (Fed. Cir. 2014) ...........................................................................9

**Federal Rules**

Fed. R. Civ. P. 56(f) .............................................................................................28

## PRELIMINARY STATEMENT

Linex's expert, Dr. Paul R. Prucnal, showed that Paulraj fails to expressly or inherently teach "different codes conveyed [along with and] in said signals" as required by the Non-Spread-Spectrum Claims. The district court did not construe this evidence in Linex's favor as it was required to do. At most, Paulraj teaches transmitting its "special" or "known" signals using a "special transmission format." It fails to describe the particulars of the format, much less that the format *necessarily* conveys the "special" or "known" signals along with and in the signals carrying payload data. Additionally, the court misconstrued the claims to require originating from a single *data* source, as opposed to *transmitting* "from a single source." None of Defendants' arguments shows that the Non-Spread-Spectrum Claims require only a single source of data instead of a single source of *transmission*. To the contrary, the language of the claims and amendments made during prosecution to distinguish over Bruckert shows that the claims require transmission from a single source. Accordingly, the district court erred in granting summary judgment of anticipation of the Non-Spread-Spectrum Claims.

On the Spread-Spectrum Claims, the claims, specification, and ordinary meaning of "data" do not limit "spread spectrum signals" to conveying only "unknown" data. None of the passages and references that Defendants identify in their opening brief suggests that "data" cannot be "known" data. Dictionaries,

including technical dictionaries from the IEEE, whose publications Defendants cite as authority, broadly define "data" to encompass both known and unknown data. Further, other district courts have construed "spread spectrum" signals without limiting such signals to only "unknown" data. Even if "data" were somehow limited to "unknown" data, Dr. Prucnal demonstrated how the accused Wi-Fi products use "spread spectrum signals" by spreading unknown payload data in the signals. This creates a genuine dispute of material fact on whether the accused products' meet the "spread spectrum signals" limitation. Accordingly, since the lower court misconstrued the "spread spectrum signals" limitation and did not weigh the evidence in Linex's favor, it erred in granting summary judgment of noninfringement of the Spread-Spectrum Claims.

Defendants discuss at length why they believe orthogonal frequency division multiplexing (OFDM) is the opposite of spread spectrum technology. (RedBr. 1-19.) First, the relevant inquiry is not whether OFDM is spread spectrum, but whether the accused products infringe the claims. According to the evidence presented by Dr. Prucnal, the answer to that question is yes. Second, numerous patents, technical journals, and references in the art show that OFDM is a type of signal modulation that is often used in spread spectrum as well as non-spread spectrum systems. (BlueBr. 29; A1671; A4198; A1665; A2144.) The fact that the accused products employ OFDM processing does not mean that they do not meet

2

the "spread spectrum signals" limitation. Defendants' attempt to draw a distinction between OFDM and spread spectrum is simply a distraction, and the Court should focus on the actual issues under appeal.

REPLY IN SUPPORT OF LINEX'S APPEAL

I. **THE DISTRICT COURT'S SUMMARY JUDGMENT OF ANTICIPATION SHOULD BE REVERSED**

A. **Paulraj Fails to Expressly or Inherently Teach Transmitting "Special" Signals or "Known" Signals *Along With* and *In* the Signals Carrying Payload Data as Required by the Non-Spread-Spectrum Claims**

As Linex explained (BlueBr. 23, 45-47), Paulraj does not teach how either of its "special" or "known" signals is formed or transmitted relative to any payload data sent from the transmit stations. (A2555 at 10:7-20; A3227-28.) Paulraj merely teaches that "special" signals are transmitted at regular intervals. (A2555 at 10:7-15; A3227.) Alternatively, in another embodiment, it teaches that "known" signals may be simultaneously transmitted from each tower. (A2555 at 10:15-20; A3227.) Beyond that, however, Paulraj does not disclose how either the "special" or "known" signals are transmitted, much less that they are transmitted *along with* and *in* the signals carrying payload data.[1] (*See* BlueBr. 23, 45-47.)

Failing to show that Paulraj expressly teaches "different codes conveyed [along with and] in said signals," Defendants appear to allege that Paulraj *inherently* discloses conveying codes along with and in the signals carrying

---

[1]     Defendants assert Linex has treated the claim terms "along with" and "in" synonymously. (RedBr. 34 n.11.) Linex disagrees to the extent that Defendants are trying to read out either claim term by not requiring that codes be conveyed along with *and* in the signals carrying payload data.

payload data.    That is, Defendants argue that the "process of updating characterization information 'during signal reception' and 'continuously' *requires* that the training signals be conveyed with the signals conveying the underlying data." (RedBr. 36.)  Defendants are mistaken.

Just because Paulraj discloses that (1) "array characterizing data is directly (or indirectly) updated during signal reception" (A2555 at 9:66-68), or that (2) "spatial filter parameters [are] updated continuously" (A2555 at 9:68-10:1), does not mean Paulraj necessarily teaches conveying codes along with and in signals carrying payload data because the "special" or "known" signals could be sent continuously but separate from payload data.  (A3227.)  *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991) (anticipation through inherency requires showing that the claimed feature is "necessarily present in the thing described in the [prior art] reference").  Linex submitted undisputed evidence that, as a technical matter, the updates could occur during reception of "special" or "known" signals separate from payload data, and not necessarily during reception of signals carrying payload data.  (A3227-28; A2555 at 10:3-20.)

Further, even if the updates occurred during reception of signals carrying payload data, such updates do not necessarily require that "special" or "known" signals be conveyed along with and in the signals carrying payload data.  As Linex's expert explained, the updates could be based on "special" or "known"

5

signals that were transmitted separate from the signals carrying payload data. (A3227-28; A2555 at 10:3-20.)  For example, Paulraj's disclosure of a "tracking mode," "continuous[]" tracking, or transmitting "known" signals from all transmit antennas does not necessarily require the "special" or "known" signals be transmitted in the same signal, such as in the same packet, as payload data. (A3227-28.)

The passages from Paulraj quoted by Defendants do not prove the contrary. (RedBr. 38-40.)  Defendants cite the abstract and column 6, line 66, to column 7, line 13, of Paulraj, but these sections merely disclose using a "signal splitter" to decompose a data signal into multiple low-rate signals for transmission and distinguishing those low-rate signals based on the directions-of-arrival.  (A2543; A2553-54.)  Similarly, column 7, lines 50-52, also cited by Defendants, simply discloses receiving the multiple signals at receiving stations.  (A2554.)  Column 8, lines 24-48, and column 9, line 39, to column 10, line 2, merely disclose a "spatial filter" to selectively receive a signal arriving at an antenna array from the specified direction.  (A2554-55.)  Column 10, lines 3-15, teaches transmitting a "special" signal in one embodiment; it says nothing about how that "special" signal is transmitted relative to payload data.  (A2555.)  Column 10, lines 15-20, discusses transmitting "different, but known" signals from each transmission tower in another embodiment.  (A2555.)  None of these passages or anything else in Paulraj

6

discloses the format of the "special" or "known" signals relative to signals carrying payload data. (A3227-28.) At most, Paulraj refers to using a "special signal transmission format[]" (A2555 at 10:5-6), but fails to describe the format or that the format includes conveying the "special" or "known" signals along with and in signals carrying payload data.

Defendants allege Dr. Prucnal agrees that Paulraj discloses an embodiment meeting the "codes conveyed [along with and] in said signals" limitation. (RedBr. 37.) But Defendants mischaracterize Dr. Prucnal's testimony. When read in full, the cited portion of Dr. Prucnal's declaration actually states that Paulraj *fails* to teach "codes conveyed [along with and] in said signals":

> The Paulraj '599 patent teaches that array characterizing data may be "updated during signal reception" (*id.* at 9:68). The Paulraj '599 patent also separately teaches special "different, but known" signals may be sent to measure array characterizing data. *Id.* at 10:3-20. But Paulraj does not disclose whether the special "different, but known" signals disclosed to measure the array characterizing data are also used to update the array characterizing data during signal reception of payload data. Indeed, Paulraj does not teach or provide *any* description of how the training signals would be sent during such signal reception. That is, *Paulraj does not teach that the training signals would be conveyed along with and in signals that also carry payload data.*

(A3227-28 (second emphasis added).)

Defendants further incorrectly argue that Linex's theory of infringement is fatal to its theory of validity. (RedBr. 36-37.) Specifically, they allege Paulraj's "special" and "known" signals "qualify as *both* the 'codes' *and* 'data' claimed in

the patents-in-suit, and [thus] satisfy the 'codes conveyed [along with and in] said signals' limitation." (*Id*.) First, Defendants have never asserted that Paulraj's "special" or "known" signals satisfy the "data" claimed in the patents-in-suit or read the asserted claims onto Paulraj in that manner. Second, even if Paulraj's "special" or "known" signals qualified as both the "codes" and "data" claimed in the patents-in-suit, such a reading would fail to meet other limitations in the claims, such as the requirement that data from the transmitted signal be multiplexed "to form a single stream of data." (A125 at 28:14-20; A152 at 27:64-67.) Paulraj does not teach multiplexing data from "special" or "known" signals—it merely teaches multiplexing data from separate signals carrying payload data. (A2554 at 8:11-13.)

In contrast, under Linex's infringement theory, the accused products receive a signal (i.e., a packet) containing HT-LTFs, P codes, pilots, and payload data. (BlueBr. 27-28.) The P codes and pilots are codes conveyed along with and in the same signal (i.e., the same packet) as the HT-LTFs and payload data. (BlueBr. 27-29.) The accused products combine and multiplex the payload data from the packet based on the P codes and pilot codes conveyed in the packet, thereby meeting the "multiplexing" limitation of the claims as well as the "codes conveyed [along with and in] said signals" limitation. (BlueBr. 31; A3237.)

8

## B.    The Non-Spread-Spectrum Claims Require Signals Transmitted From a Single Source

As set forth in Linex's opening brief, the district court erred by not interpreting the claim language "different signals transmitted . . . from a single source" to require transmitting from a single source.  (BlueBr. 47-48.)  This interpretation makes the most sense given the plain claim language.  (*Id.*)  Indeed, the claims recite three prepositional phrases—"on separate carrier waves," "from a single source," and "over a wireless channel"—immediately following the verb "transmitted" and, as a technical matter, it makes the most sense for these three prepositional phrases to modify the verb "transmitted" instead of the noun "signals."  (*Id.*)

Defendants respond with the following four arguments: (1) the claims of one of the patents—the '812 patent—refer to a "single data source" and "demultiplexing said single data source"; (2) the specification limits the claims to a single data source, not transmitting from a single source; (3) the prosecution history confirms that "single source" is just a single source of the underlying "data"; and (4) parsing the claims supports their interpretation of the "single source" limitation.  (RedBr. 26-32.)  Each argument is addressed in turn below.

First, the difference in language between the '812 and '219 claims shows that both require *transmission* from a "single" source, not that both require a "single *data* source."  As Defendants conceded (RedBr. 26), only the '812 claims

9

recite "single data source" and "demultiplexing said single data source" (A152 at 27:50-53)—the '219 claims do not. Instead, the '219 claims simply recite "single source." (A125 at 28:4-8.) In contrast, the asserted '812 and '219 claims recite either "transmitted . . . from a single data source" or "transmitted . . . from a single source." (A125 at 28:5-6; A152 at 27:50-51.) Thus, the language of the '219 claims requires *transmission* from a "single" source, and only the '812 claims additionally require that the data also originate from a "single data source."

Defendants allege that the differences in claim language between the '219 and '812 claims—i.e., "single data source" versus "single source"—are irrelevant. (RedBr. 26 n.9.) Linex disagrees. The '219 claims do not necessarily require transmission from a single "data" source. But both the '219 and '812 claims require *transmission* from a "single" source.

This is further made clear by the claim language requiring the transmitted signal to contain "data symbols." (A125 at 28:4-5; A152 at 27:49-50.) The specification describes the data symbols as transmitted symbols. (A113 at 4:49-50 ("The antenna system is for transmitting data having symbols over a communications channel.").) The data symbols may be "QPSK, BPSK, . . . ," which are *transmission* symbols radiated by the antennas on "carrier" waves. (A114 at 5:52-54.)

Defendants' second argument—that the specification consistently discloses a single data source—ignores that the specification also consistently discloses transmitting from a single source. For example, the specification discloses that the "source" is a single source of transmission—such as a "terminal" or "base station" (A113 at 4:36-37) or a "car" (A114 at 6:43)—not just a source of data. Further, all of the patent figures cited by Defendants depict transmitting from a single source using antennas TA1 to TA4 at the single source, and not just simply demultiplexing from a single data source. (A107 (Figs. 1 and 2); A109 (Figs. 4 and 5).) Additionally, when describing the spacing for transmit antennas versus receive antennas, the specification distinguishes between the two. For the transmit antennas, the specification recommends that they should be "at least a quarter wavelength" apart. (A114 at 5:35-39.) In contrast, for the receive antennas, the specification explains that they should be "as far apart as practicable." (A112 at 2:47-51.) Hence, the specification shows the transmit antennas are spaced close together—indeed, close enough so that a receiver views them as a single source—but the receive antennas, in contrast, are spaced as far apart as practicable.

Defendants also argue that the specification uses the term "source" only once, referring to "one source of *data*." (RedBr. 27 (citing A112 at 1:56).) But, when read in context, this part of the specification actually supports Linex's interpretation. Specifically, the specification refers to data coming from a transmit

11

antenna and the problems encountered in the prior art when a transmit antenna—i.e., the source of data—is "shadowed."    (A112 at 1:52-56.)    Hence, the specification refers to a transmit antenna as the "source," which again shows that the claimed "source" refers to a source of transmission, not just simply a "data" source.

Defendants' third argument—based on the prosecution history—is also flawed.    During prosecution, Linex amended its claims to recite "from a single source" and "a plurality of different signals" to distinguish the prior art Bruckert patent on two separate grounds: (1) Bruckert failed to teach transmitting "from a single source" because Bruckert transmits from two base stations 104 and 106; and (2) Bruckert failed to teach transmitting "a plurality of different signals" to be multiplexed at the receiver because Bruckert transmits the same signal at each of base stations 104 and 106.  (*See* BlueBr. 20-21, 48-49; A1996; A2006.)  With respect to the first ground, like Bruckert, Paulraj also transmits from multiple sources—i.e., from transmitting stations 1, 2, and d as shown in Figure 2 of Paulraj—so neither reference anticipates the claims.  (A2545; A2548 (transmitters 1, 2, and d in Fig. 5 of Paulraj); A3225-26.)  With respect to the second ground, unlike Bruckert, Paulraj does not teach transmitting the same signal at each base station, but that is relevant only to the "plurality of different signals" limitation, not the "transmitted . . . from a single source" limitation.    Thus, contrary to

12

Defendants' argument—which confuses the two grounds for distinguishing Bruckert (RedBr. 27-29)—the prosecution history confirms that Paulraj fails to anticipate the asserted claims because, like Bruckert, Paulraj fails to teach transmitting from a single source.

Finally, Defendants' fourth argument incorrectly parses the preamble of claim 97 of the '219 patent as follows:

> A receiver system for recovering data conveyed in data symbols by a plurality of different *signals* [1] transmitted on separate carrier waves [2] from a single source [3] over a wireless channel, said signals being differentiated by different codes conveyed along with said signals . . . .

(RedBr. 29 (alterations in original) (emphasis added) (quoting A125 at 28:4-8).) But, as Linex explained in its opening brief, that parsing does not make sense. (BlueBr. 48.)

Specifically, Defendants' proposed parsing would give the first prepositional phrase "on separate carrier waves" a connecting verb, but leave the other prepositional phrases—"from a single source" and "over a wireless channel"— without a connecting verb. (*Id.*) As a technical matter, it makes more sense for all three phrases to modify "transmitted" because the first and third prepositional phrases—"on separate carrier waves" and "over a wireless channel"—necessarily refer to transmitting. Because these prepositional phrases bookend the "from a single source" limitation, the most natural reading requires all three prepositional

phrases to modify "transmitting."  Defendants proposed parsing is also implausible in view of the prosecution history.   As Defendants acknowledged in their comparison of amended application claim 104 with original application claim 104 (which ultimately issued as claim 97 of the '219 patent), the claim originally recited the following:

> 104.   A receiver system for recovering data symbols conveyed in signals transmitted from a source over a wireless channel, comprising
> . . . .

(A1396.)  The original claim language shows that the limitation "from a source" modifies the verb "transmitted."   Linex subsequently amended the claim to distinguish Bruckert.  (BlueBr. 20-21, 48-49; A1996; A2006.)  The amendment emphasized that the transmission was "from a *single* source" (emphasis added) because Bruckert disclosed transmitting from multiple sources.  The amendment did not alter the fact that the prepositional phrase modified the term "transmitted" and not "signals."

Defendants nonetheless argue that Linex's parsing would encompass systems where Linex's invention would provide "no alleged benefit" to "constraining the [system] to a single point of transmission."  (RedBr. 31.)  In so arguing, Defendants turn the single-point-of-transmission feature on its head.  The claims require that feature because that is the very problem in the prior art that the invention seeks to solve.  The inventor, Dr. Schilling, recognized that in MIMO

14

systems where the transmit antennas are close together, it would be difficult for the receive antennas to discern which transmitted signal came from which transmit antenna. (A112 at 1:34-56; A1121; A3206-07.) Dr. Schilling thus conceived the idea of transmitting different codes along with and in the different transmitted streams in a MIMO system to allow the receiver to determine which transmit antenna the transmitted streams came from—sort of like having a return address (i.e., the code) on an envelope that allows the recipient to identify which piece of mail (i.e., transmitted stream) came from whom (i.e., from which transmit antenna). (A113 at 4:9-11 ("four[-]code transmitter [for] four antennas"), 4:14-15 ("transmitter having two codes [for] two antennas"), 4:34-45.) In this manner, the separate streams can be identified and recovered in spite of the distortion and interference in the communication path. (A1121; A3206-07.) Thus, the claims require signals transmitted from a single source because it is directed to solving the problem associated with MIMO systems that transmit from a single source. (*See* BlueBr. 8-13.)

Finally, even if Defendants' proposed parsing were correct (which it is not), the claims would not read on Paulraj. Under Defendants' parsing, the prepositional phrases "from a single source" and "over a wireless channel" modify the noun "signals." Hence, Defendants' parsing requires the "signals" from the source to be over a *wireless* channel. The Paulraj "source" that Defendants

contend meets the "single source" limitation is broadcast studio 50, not the transmitting stations. (A26; A3051.) The signals coming from broadcast studio 50 are over *wired* channels, not wireless channels. (A2545 (showing wired lines 52, 54, and 56 in Fig. 2).) Thus, even under Defendants' incorrect parsing, Paulraj fails to anticipate the claims.

### C.    Paulraj Does Not Disclose Signals *Transmitted* From a Single Source but Rather Teaches Doing the Opposite

Defendants argue that, even if the Non-Spread-Spectrum Claims require signals *transmitted* from a single source, Paulraj would still anticipate the claims. (RedBr. 32-33.) Defendants' argument is incorrect.

Specifically, Defendants cite several passages in Paulraj, i.e., column 11, lines 6-25, that allegedly disclose applications involving transmitting from a single source, but none of those passages discloses any such thing. (RedBr. 33 (citing A2556 at 11:6-25).) For example, one passage (A2556 at 11:15-18) mentions having mobile transmitting stations instead of fixed transmitting stations, but that does not change the fact that Paulraj teaches each transmitting station must be widely spaced from the other transmitting stations so that a receiver can distinguish signals based on their direction of arrival. (A2545; A2548; A2552 at 4:6-10; A3226.) That is, just because Paulraj suggests that the transmitting stations may be mobile does not change the fundamental approach to his solution, which is to have the transmitters (mobile or otherwise) be widely separated such that the receiver

16

views them as separate sources based on the "distinct angles of arrival at the receiver." (A2552 at 4:6-10.)

The same is true for the other passage cited by Defendants (RedBr. 33 (citing A2556 at 11:19-22)), which mentions using Paulraj's solution in mobile radio or cellular telephony. Again, Paulraj simply suggests using transmitting base stations, like transmitting stations 1, 2, and d in Figure 2 (A2545), as separate sources to transmit to a receiving mobile radio or cellular phone. Nothing in the cited passage teaches using his solution to transmit from a single source, such as from co-located transmitting antennas on the mobile radio or cellular phone itself. Indeed, doing so would render Paulraj's solution inoperable. As Linex's expert explained, if the transmitting antennas "were located at the same source or within close proximity of one another, the direction-of-arrival for all the received signals would be the same. In that case, . . . the receiving system in the Paulraj '599 patent would be unable to distinguish between incoming signals." (A3228.)

## II. THE DISTRICT COURT'S SUMMARY JUDGMENT OF NONINFRINGEMENT OF THE SPREAD-SPECTRUM CLAIMS SHOULD BE REVERSED

### A. Neither the Claims, Specification, or Ordinary Meaning of "Data" Limits Spread Spectrum Data to "Unknown" Data

It is undisputed that P codes spread HT-LTF data in the 802.11n packets (i.e., the signals) received by the accused products. (A3238-39.) Despite this uncontroverted fact, Defendants allege that the 802.11n packets are not "spread

spectrum signals" simply because the HT-LTF data is not "unknown data." The district court's arbitrary restriction on the meaning of "data" is unsupported by (1) the claim language, (2) the specification, and (3) the ordinary meaning of data in the art.

First, the claims do not require data in a "spread spectrum signal" to be unknown. The claims do not recite anything regarding the "knowability" of spread spectrum signals or any data conveyed in them. (A126 at 29:31-49.) The only portions of the claims that Defendants identify to argue the contrary is the claim language on "recovering" data and "detecting" codes, which they allege requires all data in the "spread spectrum signal" to be unknown. (RedBr. 43-44.) But, there is nothing inherent in the use of the term "recovering" that would suggest "data" must be unknown. One may "recover" known data, especially if the data— known or otherwise—has been garbled during transmission. And whether or not codes are "detected" does not weigh in either direction of whether data must be known or unknown.

Second, the specification never defines or implies that any portion of the transmitted signal, including "data," must be unknown, and Defendants cannot point to any passage that does so. In the only instance where the specification defines "data," it does so broadly by explaining that "data" is transmitted as "symbols," which may be "bits" or "groups of bits." (A113 at 4:50-52.) It does

18

not further limit "data" to "unknown" data. Thus, data may include any information represented as bits, whether it is bits representing unknown data or a predetermined sequence of bits representing known data, like codes. (A12.)

Third, Defendants have not identified anything that restricts the ordinary meaning of "data" to unknown data. Contrary to Defendants' assertions, the 802.11n standard and Naguib reference do not restrict "data" to "unknown" data. (RedBr. 45-47; A2932; A2798.) The data transmitted in the payload data fields of the packets in the 802.11n standard or the signals in the Naguib reference can just as easily be "unknown" as "known" data.

The 802.11n standard and Naguib reference also never state that codes and pilots are not data. The Institute of Electrical and Electronics Engineers (IEEE), which publishes the 802.11n standard, published a definition of "data" to be used in technical documents like the 802.11n standard. The IEEE's definition of "data" is "[a]ny representation of a digital or analog quantity to which meaning has been assigned."[2] (A4238.) This is consistent with Linex's dictionary definition:

_____

[2] Linex asks the Court to take judicial notice of the IEEE dictionary. This Court has taken judicial notice of dictionary definitions in other cases. *See Williamson v. Citrix Online, LLC*, 770 F.3d 1371, 1379 (Fed. Cir. 2014) ("[J]udges are free to consult dictionaries and technical treatises at any time . . . ." (alteration in original) (citation and internal quotation marks omitted)); *Stewart-Warner Corp. v. United States*, 748 F.2d 663, 669 (Fed. Cir. 1984).

"[n]umerical or other information represented in a form suitable for processing by computer." (A3256.) Neither definition limits data to "unknown" data.

Numerous prior art references similarly show that a person skilled in the art at the time of the invention would have known that "spread spectrum signals" may include signals carrying known data. The Gilhousen patents submitted during prosecution of the patents-in-suit identify pilot signals as an example of "spread spectrum signal[s]," even though those signals contain only known data. (A1330 at 18:14-16.)

Defendants argue that Gilhousen merely discloses the pilot signal as an "*unmodulated* spread spectrum signal" that is not "spread" across the bandwidth in any way, but Defendants mischaracterize Gilhousen. (RedBr. 51.) Although Gilhousen's pilot signal may not be modulated with payload data, Gilhousen explains the known data on the pilot signal is still spread to generate a "spread spectrum signal." (A1330 at 18:14-16, 18:44-49.) Gilhousen refers to the spread pilot signal as "spread *data*." (A1333 at 24:58, 24:67 (emphasis added).)[3]

Gilhousen does its spreading in the same manner that Linex's preferred embodiment generates a spread spectrum signal. (A1330 at 18:14-16.) That is,

---

[3]   As Dr. Prucnal explains, other prior art, *e.g.* Kotzin, also describes generating a spread spectrum signal by spreading known data. (A3125 (explaining how Kotzin teaches spreading a known Walsh sequence with a pseudo-random code); A1364 at 6:38-40.)

Gilhousen's pilot signal contains a known sequence (i.e., a Walsh "zero" sequence). (A1330 at 18:44-47.) Gilhousen spreads the bandwidth of the known sequence by applying a pseudo-noise (PN) code to it. (A1330 at 18:47-49.) This is identical to Linex's preferred embodiment, which also spreads data by applying a PN code. (A114 at 6:34-36.) Thus, Gilhousen teaches that "spread spectrum signal[s]" include signals with known data that has been spread and expressly refers to such signals as "spread spectrum signal[s]." (A1330 at 18:14-16, 18:44-49.)

### B.    Contrary to Defendants' Suggestion, Other Courts Have Not Limited "Spread Spectrum Signals" to Only "Unknown" Data

Linex previously successfully asserted the '322 patent—the parent of the '219 and '812 patents—in the Eastern District of Texas. *Linex Techs., Inc. v. Belkin Int'l, Inc.*, No. 2:07-cv-00222-JDL (E.D. Tex. June 1, 2007). Contrary to Defendants' suggestion (RedBr. 2, 16), that court did not limit "spread spectrum signals" to "unknown" data (A1431 (construction for "plurality of spread-spectrum signals")). Rather, Magistrate Judge Love construed "spread-spectrum signals" as "signals processed with one or more codes that distributes each signal across the available bandwidth."[4] (A1431.)

---

[4]    The *Belkin* case ended after the last infringer stipulated that its "products that comply with any version of the 802.11n standard infringe the claims of the '322 patent." Joint Motion to Dismiss at 3, *Linex Techs., Inc. v. Belkin Int'l, Inc.*,

(continued…)

The Southern District of Florida also did not construe "spread-spectrum" signals to require unknown data.  Claims Construction Order at 3, *Linex Techs., Inc. v. Motorola, Inc.*, No. 9:05-cv-80300-KAM (S.D. Fla. Nov. 17, 2010), Dkt. No. 152.  There, Judge Marra interpreted "spread-spectrum" as used in Linex's patents as "[a] form of communication in which a signal is spread over greater bandwidth than is necessary to transmit the signal."  *Id.*  Again, spread spectrum signals were not limited to only "unknown" data.  *Id.*

## C.     As Properly Construed, the Accused Products Infringe the Spread-Spectrum Claims

Defendants contend that even if "data" includes "known data," the HT-LTFs do not satisfy the Spread-Spectrum Claims because HT-LTFs fail to meet the limitation "multiplexing data derived from . . . data symbols."  (RedBr. 52-53.) Defendants mischaracterize the "multiplexing" limitation and ignore issues of material fact.  Contrary to Defendants' allegations, the claims do not require spread data, like HT-LTFs, in the "spread spectrum signals" to be multiplexed.  Instead, the claims require "multiplexing data derived from . . . data symbols" obtained from the received signal.  (A126 at 29:47-49; A152 at 28:47-50.)  Defendants' accused products meet this requirement.

---

(…continued)
No. 2:07-cv-00222-JDL (E.D. Tex. Nov. 19, 2009), Dkt. No. 338 (accused infringer Phoebe Micro, Inc. stipulating to infringement and limiting trial to damages-related issues).

Specifically, the accused products receive a signal (i.e., a packet) containing HT-LTFs, P codes, pilots, and payload data. (BlueBr. 27-29; A3237; A3415.) The received packet is a "spread spectrum signal" because it contains HT-LTF data that has been spread with P codes and payload data symbols that have been spread with pilots. (BlueBr. 30; A3239; A3241.) The accused products combine the payload data symbols from the packet received at one receive antenna with payload data symbols from the packet received at a different receive antenna. (BlueBr. 30-31; A3244-48.) After combining the payload data symbols, the accused products derive data from the combined data symbols and multiplex the derived data to form a single stream. (BlueBr. 31; A3236-37.) Thus, the accused products meet the limitation "multiplexing data derived from . . . data symbols" obtained from the received signals (i.e., the received packets). (BlueBr. 31; A3236-37.)

### D. The District Court Erred by Ignoring Dr. Prucnal's Testimony, Which Raised Genuine Issues of Material Fact

Even if this Court affirms the district court's claim construction, it should nonetheless reverse the summary judgment of noninfringement. As explained in Linex's opening brief, the district court erred in granting summary judgment for an additional reason: Linex's expert testimony creates a genuine dispute of material fact as to whether the accused products' OFDM processing of payload data with pilots meets the "spread spectrum signals" limitation as defined by the district

court.  (BlueBr. 54-55.)  Defendants respond that the pilot signals never alter the payload data or spread it across the available bandwidth.  (RedBr. 55.)

But the district court's construction of "spread spectrum signal" does not require "altering" data.  It simply requires "spread spectrum signals" to be "signals corresponding to data which has been processed with one or more codes that distributes and increases the bandwidth of the data across the available bandwidth."  (A7.)  At a minimum, Dr. Prucnal's declaration creates a genuine issue of material fact.

As Dr. Prucnal explained in detail, "[p]ilots spread the bandwidth of the payload data in the [802.11n] packet" in that they "are mixed into the subcarriers of the data symbols carrying payload data in the packet to increase the bandwidth of the data symbols carrying payload data."  (A3241.)  Continuing, Dr. Prucnal explained that, "[i]n the payload data portion of the packet, payload data are inserted onto certain IDFT subcarriers.  Pilots are inserted onto IDFT subcarriers *disbursed among the data subcarriers and[, after IDFT processing,] increase the bandwidth* used to transmit the payload data portion of the OFDM packet." (A3241 (emphasis added).)  It is undisputed that payload data in the 802.11n packet is "data" recited in the district court's construction of "spread spectrum signals."  Thus, the 802.11n packet meets Defendants' proposed construction of a "spread spectrum signal" because "it is a 'signal corresponding to data' (i.e.,

24

payload data) that 'has been processed with one or more codes' (i.e., pilots)."
(A3241.)

Defendants nonetheless allege that Dr. Schilling agreed that pilots do not process or spread the payload data. (RedBr. 55.) But Defendants mischaracterize Dr. Schilling's testimony. Dr. Schilling never testified that pilots do not "spread" the payload data in the accused products. The testimony cited by Defendants (*id.* (citing A3554 (Schilling Dep. 443:17-22)) does not refer to anything relating to "spreading." Rather, when viewed in full (see below), the cited testimony merely shows that Dr. Schilling did not believe that the pilots in the 802.11n system processed the payload data by "modulat[ing]" the data, such as by "AM modulation" or "FM modulation." (A3554 (Schilling Dep. 443:3-22).) He certainly was not asked whether the pilots are used to spread the payload data.

> Q. Specifically you talked about pilot signals that are on various subcarriers?
>
> A. Right.
>
> Q. Do those pilot signals modulate data?
>
> A. Do they modulate data? By that you mean an AM modulation or an FM modulation, something like that? Where they act to modulate? I don't know what you mean by --
>
> Q. Do the pilot signals process data in any way?
>
> A. In, say, an OFDM system?
>
> Q. Correct.
>
> A. In the 802.11n system?

25

Q. We can take the 802.11n system.

A. I believe the pilot signals have their own unique channel and they do not vary with the data.

Q. So they don't process the data?

A. They do not process a sub-channel of data.

Q. Do they process any other kind of data?

A. No.  They do not process the data.

(*Id.*)

Defendants incorrectly require that a signal must be modulated in order to be a "spread spectrum signal."  (RedBr. 51.)  It has never been Linex's position that the accused products modulate the payload data with a pilot because such modulation is not required to generate a "spread spectrum signal" or required by the district court's construction for that term.  As Dr. Prucnal has explained, the Gilhousen patents show that a signal can contain no payload data modulation but still be a "spread spectrum signal."  (A3214; A1330 at 18:14-17 ("The pilot channel contains no data modulation and is characterized as an unmodulated *spread spectrum signal* . . . ." (emphasis added)).)

## RESPONSE TO DEFENDANTS' CROSS-APPEAL

In its cross-appeal, Defendants ask this Court to reverse or vacate the district court's ruling that the Spread-Spectrum Claims were not anticipated by Paulraj.[5] (RedBr. 61.)  For the reasons below, this Court should deny Defendants' request.

## III.    STATEMENT OF FACTS

The only validity issue before the district court on summary judgment was anticipation over Paulraj, and it was only that issue that the district court decided. As the court explained, the parties' validity dispute centered on whether Paulraj disclosed three limitations: (1) signals from a single source; (2) codes conveyed along with said signals; and (3) spread spectrum signals.  (A25.)  Although it did not move for summary judgment of no anticipation in view of Paulraj, Linex argued that Paulraj did not disclose spread spectrum signals.  After construing the claims and evaluating Paulraj's disclosure, the district court agreed, stating: "Nothing in Paulraj describes a code that processes data in a way that distributes the signal across the available bandwidth [i.e., creating spread spectrum signals]. The 'spread spectrum signals' limitation is the only element of the claimed invention not disclosed by Paulraj.  Because this element appears in some of the asserted claims . . . , those claims are valid."  (A30.)  Thus, the district court held

---

[5]    Defendants have also submitted a motion requesting leave for clarification from the district court on this issue.  Dkt. No. 61.  Linex opposes that motion because no clarification is required.  Dkt. No. 66.

that the Spread-Spectrum Claims are valid and not anticipated by Paulraj as a matter of law.  (A30.)

## IV.   ARGUMENT

### A.   The District Court Properly Found Summary Judgment of No Anticipation by Paulraj for the Spread-Spectrum Claims

Although Linex did not formally move for summary judgment of no anticipation in view of Paulraj, Linex did argue that Paulraj failed to disclose the "spread spectrum signals" limitation.  (A3202; A3231.)  District courts have the power and authority to grant summary judgment sua sponte to a nonmovant, Fed. R. Civ. P. 56(f), and this Court has reviewed such summary judgments in several cases, including *National Presto Industries, Inc. v. West Bend Co.*, 76 F.3d 1185 (Fed. Cir. 1996).  There, West Bend moved for summary judgment of invalidity based on two Japanese publications.  *Id.* at 1189.  Although Presto did not separately move for summary judgment of validity, the district court held that West Bend did not meet its burden of proof and found the claims at issue valid over the two Japanese publications.  *Id.*  On appeal, West Bend challenged the district court's summary judgment findings on the merits and on procedural grounds.  *Id.* at 1188.  This Court explained that "[t]he trial court has authority to dispose of issues summarily when the requirements of Rule 56 are met, provided that the adversely affected party has an adequate opportunity to respond and the summary procedure does not deny due and fair process."  *Id.*  Because West

Bend's motion for summary judgment set forth extensive arguments on the validity issue, the Court found that West Bend had a "full opportunity to respond and did respond to Presto's position that the . . . patent [at issue] was not invalid." *Id*. at 1189. Thus, the Court affirmed the district court's sua sponte grant of summary judgment. *Id.*

The Court should do the same here. Defendants moved for summary judgment of invalidity of the asserted claims as anticipated by Paulraj and had a full and fair opportunity to respond to Linex's arguments that Paulraj did not anticipate those claims. The district court here went further than the court in *National Presto Industries.* After considering the parties' arguments and materials, the court not only found that Defendants failed to meet their burden, but also determined that "[n]othing in Paulraj describes a code that processes data in a way that distributes the signal across the available bandwidth. The 'spread spectrum signals' limitation is the only element of the claimed invention not disclosed by Paulraj." (A30.) Because anticipation requires that a single prior art reference disclose every limitation in the claims, the district court correctly found that the Spread-Spectrum Claims were not anticipated by—and thus were valid over—Paulraj. (A30.)

**B.    The District Court Already Found Summary Judgment of No Anticipation by Paulraj Based on Linex's Proposed Construction of Spread Spectrum Signals and Infringement Theory**

Defendants based their motion for summary judgment of anticipation of the Spread-Spectrum Claims on Linex's proposed constructions and infringement theories.  (A2330; A3538.)  Thus, the district court has already considered the question of whether Paulraj discloses "spread spectrum signals" under Linex's proposed construction and infringement theory.  In doing so, the court properly found Paulraj failed to anticipate as a matter of law.  (A29-30.)

Defendants argue to the contrary, asserting that Paulraj allegedly discloses "a system that includes 'known' training signals that occupy bandwidth and are processed to be transmitted simultaneously with data signals from separate antennas, which necessarily increases the bandwidth of the transmitted signal and therefore creates 'spread spectrum signals.'"  (RedBr. 59.)  But, as discussed in Section I.A, *supra*, Paulraj fails to teach how either the "special" or "known" signals are transmitted, much less that they are transmitted *along with* and *in* the signals carrying payload data in such a manner that spreads the bandwidth of the signal carrying the payload data.  (*See* BlueBr. 23, 45-47.)  Paulraj simply does not explain the transmission format of its "special" or "known" signals, or that it is even conveyed in signals carrying payload data.  (A3227-28; A2555 at 10:3-6.)

Accordingly, Paulraj does not teach "spread spectrum signals" under Defendants' or Linex's construction of that term.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's summary judgment of noninfringement of claims 121, 131, and 132 of the '219 patent and claims 101 and 102 of the '812 patent, and affirm the ruling that these claims are not anticipated by Paulraj. This Court should also reverse the district court's summary judgment of anticipation of claims 97, 107, and 108 of the '219 patent and claims 97 and 98 of the '812 patent.


January 30, 2015                    Respectfully submitted,


                                     /s/   Kenie Ho
                                    J. Michael Jakes
                                    Kara F. Stoll
                                    Rajeev Gupta
                                    Kenie Ho
                                    FINNEGAN, HENDERSON, FARABOW,
                                      GARRETT & DUNNER, LLP
                                    901 New York Avenue, NW
                                    Washington, DC  20001
                                    (202) 408-4000

                                    Attorneys for Plaintiff-Appellant
                                    Linex Technologies, Inc.

31

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing REPLY BRIEF OF APPELLANT was served upon registered counsel by operation of the Court's CM/ECF system on this 30th day of January 2015.

/s/ Donna Stockton
Donna Stockton

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief contains 6,792 words as measured by the word-processing software used to prepare this brief.

Dated: January 30, 2015                    Respectfully submitted,


 /s/ Kenie Ho
Kenie Ho
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC  20001
(202) 408-4000